Virginia A. WEBER, Plaintiff/Appellee,

v.

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Defendant/Appellant.

Civ. No. 9629.

Supreme Court of North Dakota.

Sept. 26, 1979.

Anderson, Tossett, Berning & Dobrovolny, Minot, for defendant and appellant; argued by Collin P. Dobrovolny, Minot.

Pringle & Herigstad, Minot, for plaintiff and appellee; argued by LeRoy A. Loder, Minot.

PAULSON, Justice.

The appellant, State Farm Mutual Automobile Insurance Company ["State Farm"], brought this appeal from a judgment of the district court of Ward County. The issue presented is whether or not the North Dakota Auto Accident Reparations Act [commonly known as No-Fault Insurance], Chapter 26–41 of the North Dakota Century Code, applies to the facts of this case. We hold that it does and affirm the judgment of the district court.

The facts are simple and undisputed. Robert Weber was the owner of a 1963 Chevrolet 4-door, 1/2 ton pickup truck insured by State Farm pursuant to the provisions of Chapter 26–41, N.D.C.C. Robert, his wife, Virginia A. Weber, Brian Bradberry, and John Gabby were hunting deer on November 12, 1977. Robert was seated in the driver's seat and Virginia was seated beside him on the right side of the front seat. Bradberry was seated in the rear seat directly behind Robert and Gabby was seated behind Virginia.

Upon spotting some deer crossing the road, Weber drove his vehicle into the ditch on the north side of North Dakota Highway 5, west of Mohall. As the pickup slowed to a halt, Gabby jumped out the right rear door. As Gabby was moving out of the door, he was feeding shells into his 270-calibre bolt action rifle. Gabby testified that he was loading the rifle and exiting from the vehicle at the same time. As he closed the bolt of the gun it discharged. The bullet from the rifle went through the open right rear door, through the back of the front seat, and struck Robert in the back while Robert was still seated behind the steering wheel. Robert was pronounced dead on arrival at Mohall Hospital.

Virginia A. Weber, as surviving spouse of Robert, made a demand on State Farm for death benefits under State Farm Policy Number 533–285–D17–34B, which policy was issued pursuant to the provisions of the North Dakota Auto Accident Reparations Act, Chapter 26–41, N.D.C.C. State Farm denied coverage and the district court action ensued.

The district court, in a bench trial, found that Robert Weber was occupying the vehicle within the meaning of § 26–41–07, N.D.C.C., and that Virginia was entitled to no-fault benefits as his survivor. Judgment was entered in Virginia's favor for the policy amount of $15,000; $1,000 for funeral expenses; and $14,000 as survivor's income loss.

State Farm contends that the trial court erred because the North Dakota Auto Accident Reparations Act does not provide for coverage for this type of an accident. Counsel for State Farm argues that there was no "causal connection" between the operation of the motor vehicle and the accident which resulted. This causal connection test is one which was commonly used in interpreting the scope of coverage of insurance *policies* prior to the adoption of no-fault statutes such as Chapter 26–41, N.D.C.C.

In *Norgaard v. Nodak Mutual Insurance Company*, 201 N.W.2d 871 (N.D.1972), this court adopted the causal connection test. The facts in *Norgaard* are distinguishable from those in the instant case but somewhat similar in certain respects. On August 20, 1967, Richard Norgaard and Stanley Baldock, along with two other companions, went hunting in Norgaard's 1959

Chevrolet sedan. Norgaard spotted some birds and stopped the automobile. Using the roof of the automobile as a gun rest, Norgaard discharged his rifle in the direction of the birds. At that instant, Baldock was alighting from the automobile and was struck in the back of the head by a bullet from the rifle. He died some thirteen days later.

The issue in *Norgaard* was whether the injury and subsequent death of Baldock resulted from the operation, maintenance, or use of the automobile. This court discussed the causal connection between the accident and the scope of coverage under the policy. We held that "the use of the rifle, notwithstanding it rested upon the automobile at the time of its discharge, constituted an independent and intervening cause of the injury and death of Stanley Baldock". *Norgaard, supra*, 201 N.W.2d at 876.

*Norgaard* is distinguishable from the instant case in several ways. *Norgaard* was decided prior to January 1, 1976, the date of adoption of the North Dakota no-fault insurance law. Therefore, it was decided at a time when fault determinations were essential to the establishment of liability. The "causal connection" test was rooted in traditional negligence principles. One of the purposes of the no-fault insurance law is to avoid protracted litigation over issues of fault or causation. *Norgaard* is also distinguishable on its facts. In the instant case, Weber was seated in his car at the steering wheel. In *Norgaard*, the victim of the accident was outside of the car. Another distinguishing factor is that Norgaard's gun was already removed from the car, loaded, and aimed at its target. The accident in the instant case resulted from the act of removing the gun from the car and loading it preparatory to shooting. The major difference between the two cases, however, is that *Norgaard* was a case involving interpretation of the scope of coverage under the insurance policy, whereas in this case we are interpreting a statute.

There have been cases in other jurisdictions which have found coverage under the policy even absent a no-fault insurance stat-

ute. One such case is *Allstate Insurance Company v. Valdez*, 190 F.Supp. 893 (E.D. Mich.1961). Valdez and three other hunters were hunting small game. The three other hunters had deposited their weapons in the trunk of Valdez's automobile and were sitting inside the vehicle waiting for Valdez to complete his hunting. Valdez finished hunting and, while standing approximately twenty-five feet to the rear of the car, began ejecting shells from his shotgun. While ejecting the shells, Valdez slipped upon the icy surface of the ground and, in attempting to control his fall, turned his shotgun in the direction of the car. The butt of his gun struck the ground and the weapon discharged, firing a shell which went through the open trunk of Valdez's automobile and killing one of the hunters seated in the rear seat. The court found that coverage existed under the "loading and unloading" clause in the insurance policy. As the court said, "the ejection of the shells was an integral part of the 'loading' process, and, therefore, there was a sufficient causal relationship between the 'loading' of the automobile and the accident". *Valdez, supra* 190 F.Supp. at 896. In the court's reasoning, because Valdez was required by law to remove the shells from the gun before loading it into the trunk, the accident caused by ejecting the shells was part of the loading process, and, therefore, was covered under the policy.

We now turn to an interpretation of the North Dakota no-fault statute, Chapter 26–41, N.D.C.C. The trial court found that coverage existed as a result of the fact that Weber was a person occupying the vehicle, pursuant to § 26–41–07, N.D.C.C. Section 26–41–07(1), N.D.C.C., provides, in pertinent part:

> "*Persons entitled to basic no-fault benefits.*—Each basic no-fault insurer of a secured motor vehicle shall pay basic no-fault benefits without regard to fault for economic loss resulting from:
>
> 1. Accidental bodily injury sustained within the United States of America, its territories or possessions, or Canada by the owner of the motor vehicle or any relative of the owner:

a. *While occupying any motor vehicle,* or

b. . . ." [Emphasis added.]

■ In interpreting a statute words are to be given their plain, ordinary, and commonly understood meaning.[1] *Richard v. Johnson*, 234 N.W.2d 22 (N.D.1975); *State v. Hagge*, 211 N.W.2d 395 (N.D.1973); *Tormaschy v. Hjelle*, 210 N.W.2d 100 (N.D. 1973). Consideration should be given to the ordinary sense of statutory words, the context in which they are used, and the purpose which prompted their enactment. *State v. Jelliff*, 251 N.W.2d 1 (N.D.1977); *Wallentinson v. Williams County*, 101 N.W.2d 571 (N.D.1960); and *Salzseider v. Brunsdale*, 94 N.W.2d 502 (N.D.1959). The purpose for the Act is embodied in § 26–41–02, N.D.C.C., which states:

"*Legislative declaration.*—The legislative assembly declares that its purpose in enacting this chapter is to avoid inadequate compensation to victims of motor vehicle accidents, to require registrants of motor vehicles in this state to procure insurance covering legal liability arising out of ownership or operation of such motor vehicles and also *providing benefits to persons occupying such motor vehicles* and to persons injured in accidents involving such motor vehicles; to limit the right to claim damages for noneconomic loss in certain cases; and to organize and maintain an assigned claims plan." [Emphasis added.]

Subsection 10 of § 26–41–03, N.D.C.C., defines the term "occupying" as follows:

"*26–41–03. Definitions.*—As used in this chapter, the following definitions shall apply:

. . . . .

10. 'Occupying' means to be in or upon a motor vehicle or engaged in the immediate act of entering into or alighting from the motor vehicle."

■ Although the legislature may not have contemplated this particular type of accident, a fair reading of the terms used would indicate that they would have provided for coverage had they considered it. This position is supported by § 26–41–03(11), N.D.C.C., which defines the operation of a motor vehicle as follows:

"11. 'Operation of a motor vehicle' means operation, maintenance, or use of a motor vehicle as a vehicle. Operation of a motor vehicle does not include conduct within the course of a business of repairing, servicing, or otherwise maintaining motor vehicles unless the injury occurs off the business premises, or conduct in the course of loading and unloading the vehicle unless the injury occurs *while occupying it.*" [Emphasis added.]

Section 26–41–03 excludes from coverage persons servicing or repairing a vehicle when in the course of business. The obvious reason for that exclusion is that a person injured in the course of the business of servicing a vehicle would be protected by the workmen's compensation laws. This is consistent with the purpose in making no-fault insurance mandatory: namely, expanding the umbrella of insurance coverage to protect a wider group of people.

There is one recent case decided in a no-fault jurisdiction that at first blush may appear inconsistent with our holding here. In *O'Key v. State Farm Mut. Auto. Ins. Co.*, 89 Mich.App. 526, 280 N.W.2d 583 (1979), the policyholder was injured when he was shot by an unknown, armed assailant. The Michigan Court held that the shooting was indeed an "accident" but that it did not arise out of the use, ownership, maintenance, or operation of the vehicle, in spite of the fact that the owner was inside the vehicle with the motor running at the time of the "accident". A controlling factor seemed to be that the automobile was not the instrumentality of the injury. We are not persuaded by this case because, in essence, it applies the causal connection test in a no-fault setting.[2]

The legislature expressly excluded certain persons from coverage in § 26–41–08, N.D. C.C., which provides:

---

**1.** Section 1–02–02, N.D.C.C.

**2.** The Michigan Court in *O'Key* did not address itself to the issue of whether the term "occupy"

"*Persons not entitled to benefits.*—Basic or optional excess no-fault benefits shall not be payable to or on behalf of any person while:

1. Occupying any motor vehicle without the expressed or implied consent of the owner or while not in lawful possession of the motor vehicle.

2. Occupying a motor vehicle owned by such person which is not insured for the benefits required by this chapter unless uninsured solely because the insurance company of such owner has not filed a form pursuant to subsection 2 of section 26–41–05 to provide the basic no-fault benefits required by this chapter.

3. In the course of a racing or speed contest, or in practice or preparation thereof.

4. Intentionally causing or attempting to cause injury to himself or another person."

Nothing in § 26–41–08 N.D.C.C., indicates a legislative intent to exclude from coverage a person occupying his own car who is injured in a hunting accident.

■ In Paragraph XI of the findings of fact, the trial court noted that the State of North Dakota issues in excess of 102,000 general hunting licenses yearly, and in excess of 40,000 deer licenses on an annual basis. Section 20.1–01–05, N.D.C.C., makes it unlawful to carry any firearm with a cartridge in its chamber while in or on a motor vehicle. Because it is required by

law and also constitutes safe hunting procedure, the acts of loading a gun when alighting from a car and unloading a gun before entering a car are common practices in North Dakota. It is foreseeable that accidents like the one in the instant case will happen and the Auto Accident Reparations Act should provide coverage absent an expressed legislative declaration to the contrary. It appears that the legislature took special care in using the term "occupying a motor vehicle" in enacting Chapter 26–41, N.D.C.C., and the plain meaning of that term indicates that coverage exists in this case.

Judgment affirmed.

ERICKSTAD, C. J., and PEDERSON, VANDE WALLE and SAND, JJ., concur.

---

as used in the Michigan no-fault statute would operate to provide coverage. The Michigan Court did not cite or discuss Michigan Compiled Laws Annotated § 500.3106 (Supp.1979), which provides, in pertinent part:

"Accidental bodily injury does not arise out of the ownership, operation, maintenance or use of a parked vehicle as a motor vehicle unless any of the following occurs:

. . . . .

"(c) the injury was sustained by a person while occupying, entering into or alighting from the vehicle. . . ."

Instead, the Michigan Court concerned itself with the policy terms "caused by accident and arising out of the ownership, operation, mainte-

nance or use, including loading or unloading of a motor vehicle as a motor vehicle". The Court said "Although plaintiff was an occupant of an automobile at the time he sustained the injury, this is not a controlling situation in resolving this issue. The automobile was not the instrumentality of the injury. Rather, its role in this matter was incidental. Plaintiff's occupancy of the car was a fortuity, in no way connected with the assault". *O'Key, supra* 280 N.W.2d at 585. Because the Michigan Court decided *O'Key* on the basis of policy interpretation and neglected to discuss the meaning of the term "occupant", we are not persuaded by its reasoning. The instant case involves a question of statutory interpretation.